# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-07-00681-CV

Texas School for the Blind and Visually Impaired, Appellant

v.

Mel Dugosh, Individually and as Independent Executor of the Estate of
Christopher Dugosh; and Richard Dugosh, Individually, Appellees[1]

FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY
NO. 84515A, HONORABLE GUY S. HERMAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The dispositive issue in this appeal is whether sovereign immunity bars a wrongful-death and survival action arising from the choking death of a resident at the Texas School for the Blind and Visually Impaired (TSBVI). For the reasons we explain herein, we are compelled to conclude that it does. Consequently, because the trial court below held to the contrary in denying a plea to the jurisdiction asserted by TSBVI, we must reverse the court's order denying the plea and render judgment dismissing the action.

---

[1] TSBVI's notice of appeal identified appellees as "Mel Dugosh and Richard Dugosh, Individually and as next friend of C. D." We have corrected the caption to reflect that Mel Dugosh is appearing in her capacity as independent executor of Christopher's estate rather than as next friend.

**BACKGROUND**

On May 3, 1985, Christopher Dugosh was born with profound developmental defects that included Cornelia de Lange syndrome (a genetic disorder that can manifest through numerous physical and intellectual limitations), deformed arms and hands, severe mental retardation, hearing and vision impairments that his personal physician classified as deafness and blindness, orthopedic limitations, growth limitations,[2] and various conditions affecting his gastrointestinal tract. During Christopher's first eighteen years, his parents, Richard and Mel Dugosh, served as his primary caregivers, aided by what Richard termed some "off and on" nursing support. On August 17, 2003, his parents enrolled Christopher at TSBVI, where he lived in a dormitory environment with other students. Prior to enrollment, Christopher's physician advised TSBVI of his many medical conditions and warned that Christopher was at risk of "choking." Consequently, the physician cautioned, Christopher required a "toddler" diet with "no milk, beef, small portions."

Within a half hour following his evening meal on May 19, 2005—sixteen days after his twentieth birthday—Christopher began gasping for air, collapsed, and ultimately died. Emergency responders who were summoned to the scene reported that they found what appeared to be pieces of broccoli in Christopher's mouth. A subsequent autopsy revealed that Christopher's "upper airway was packed with chunks of poorly chewed food material including a portion of the end of a hot dog measuring 1 inch all around . . . pieces of broccoli measuring up to 1-1/2 inches in dimension as well as similar pieces of dumplings." Similarly, Christopher's "esophagus was packed with abundant amount of poorly chewed large portions of broccoli, hot dogs, dumplings and

---

[2] At age 20, Christopher was four feet, five inches in height and weighed 66.5 pounds.

other solid food material." It is undisputed that TSBVI personnel had given Christopher pieces of broccoli, hot dog, and french fries (the latter corresponds to the medical examiner's report of "dumplings") during his evening meal. The medical examiner identified the cause of Christopher's death as the "result of asphyxia due to choking on bolus [a mass] of food. A contributing condition is Cornelia de Lange syndrome."

Mr. and Ms. Dugosh, individually as Christopher's heirs and wrongful-death beneficiaries, and Mel Dugosh, in her capacity as the independent administrator of Christopher's estate, (collectively, the Dugoshes) sued TSBVI seeking monetary damages for what they alleged was negligence or gross negligence of TSBVI personnel that proximately caused Christopher's death.[3] TSBVI interposed a plea to the jurisdiction asserting that the Dugoshes' claims were barred by sovereign immunity. In support of its plea, TSBVI advanced two arguments. First, it argued that the Dugoshes had failed to allege facts that would demonstrate a negligent "condition or use" of tangible personal property that proximately caused Christopher's death, so as to come within the waiver of sovereign immunity contained in section 101.021(2) of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021(2), .025 (West 2005). Second, TSBVI argued that the TSBVI employees implicated by the Dugoshes' allegations, and from whom the institution's liability would derive, were shielded by official immunity under the education code. *See id.* § 101.021(2) (waiver tied to whether governmental unit "would, were it a private person,

---

[3] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.001-004 (wrongful-death statute), .021 (survival statute) (West 2008).

be liable to the claimant according to Texas law"); *DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995).

With their plea to the jurisdiction, TSBVI moved to dismiss the Dugoshes' claims under chapter 74 of the civil practice and remedies code, in the view that the Dugoshes' claims were "health care liability claims" and that the Dugoshes had failed to serve the expert report required by that chapter. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2005 & Supp. 2009).

Following a hearing in which both sides presented evidence, the probate court denied both TSBVI's plea to the jurisdiction and its chapter 74 dismissal motion. In its order, the court included the following pertinent "findings" or conclusions:

1.  Plaintiffs have presented facts wherein the condition and the use of tangible personal property are such that a claim can be made pursuant to the statutory waiver of sovereign immunity under the Texas Tort Claims Act;

\* \* \*

3.  Plaintiffs' claims are not subject to the expert report requirements of Texas Medical Liability Act; and

4.  the immunity provisions set out in Texas Education Code §§ 22.0511 & 22.052 are irrelevant to Plaintiffs' claims as Defendant is not an independent school district.

This appeal ensued. *See id.* § 51.014(a)(8), (9) (West 2008).

**DISCUSSION**

TSBVI brings three issues on appeal that correspond to the three grounds for dismissal it urged below. In its third issue, TSBVI argues that the probate court erred in denying its

4

plea to the jurisdiction because the Dugoshes do not assert that anything constituting a "condition or use" of tangible personal property proximately caused Christopher's death, so as to come within the sovereign-immunity waiver of section 101.021(2). In its second issue, TSBVI contends that it conclusively established that the personnel implicated by the Dugoshes' claims were shielded by official immunity, thus establishing that it would not be vicariously liable under Texas law for those actions and thereby negating a waiver under section 101.021(2). Finally, in TSBVI's first issue, it asserts that the probate court abused its discretion in denying its motion to dismiss under chapter 74 of the civil practice and remedies code. In a cross-point, the Dugoshes assert that the probate court abused its discretion in excluding certain deposition excerpts they sought to introduce during the hearing.

TSBVI's third issue and the Dugoshes' cross-point are dispositive.

**Standard of review**

A plea to the jurisdiction challenges a trial court's authority to adjudicate a plaintiff's cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). Analysis of whether this authority exists begins with the plaintiff's live pleadings. *Id.* at 226. The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Whether the plaintiff met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally and look to the pleader's intent. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading

sufficiency and the plaintiffs should be afforded the opportunity to amend. *Id.* at 226-27. If, on the other hand, the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id.* at 227.

When deciding a plea to the jurisdiction, we may consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional issues. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In fact, in a plea to the jurisdiction, a party may present evidence to negate the existence of a jurisdictional fact alleged in the pleadings. *Miranda*, 133 S.W.3d at 227. To the extent the challenge implicates the merits of the plaintiff's cause of action, as here, the party asserting the plea has the burden of negating a genuine issue of material fact as to the jurisdictional fact's existence, the same burden a movant must meet to prevail on a traditional summary-judgment motion. *See id.* at 227-28. Whether the party meets this burden is a question of law that we review de novo. *Id.* at 228. In making this determination, we take as true all evidence favorable to the pleader and indulge every reasonable inference and resolve any doubts in the pleader's favor. *Id.*[4]

**Sovereign immunity: general concepts**

Although the historical origins of the doctrine are found in concepts of royalty that are foreign to American constitutional systems, sovereign immunity is nonetheless deeply rooted in the Texas common law, although its underlying rationales have evolved considerably, and it still

---

[4] A somewhat different standard applies when a challenge to a jurisdictional fact's existence does not implicate the merits of the pleader's cause of action. *University of Tex. v. Poindexter*, ___ S.W.3d ___, No. 03-04-00806CV, 2009 WL 1896071, at *3 (Tex. App.—Austin July 3, 2009, no pet.).

stands as a barrier against suits and liability for money damages from the State, its agencies and institutions, or state personnel in their official capacities. *See City of Round Rock v. Whiteaker*, 241 S.W.3d 609, 626 (Tex. App.—Austin 2007, pet. denied) (citing *City of Galveston v. State*, 217 S.W.3d 466, 468 (Tex. 2007); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374-75 (Tex. 2006); *Tooke v. City of Mexia*, 197 S.W.3d 325, 331-32 (Tex. 2006); *Hosner v. De Young*, 1 Tex. 764, 769 (1846)). The primary contemporary justification for sovereign immunity is that individual citizens should bear the risk and cost of what are delicately termed the government's "improvident acts" because it is considered beneficial to insulate the government (and the taxpayers who fund it) from the civil liability private-sector persons would face for the same acts. *Whiteaker*, 241 S.W.3d at 626 (citing *Reata Constr. Corp.*, 197 S.W.3d at 375; *Tooke*, 197 S.W.3d at 331-32).

Where it applies, and unless it is waived, sovereign immunity from suit deprives a trial court of subject-matter jurisdiction. *Id.* Consequently, because they seek to recover money damages from TSBVI (which, they do not dispute, is a state institution), the Dugoshes' suit implicates sovereign immunity, which, unless waived, deprives the probate court of subject-matter jurisdiction over their suit. *See id.*

While sovereign immunity is a common-law doctrine that is ultimately within the Texas Supreme Court's province to modify or even abrogate, *see Texas Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 592-93 (Tex. 2001) (Hecht, J., concurring), the high court has nonetheless deferred to the legislature to decide when, if, or how to waive such immunity where it applies, in the view that this body is better suited to weigh the public-policy considerations that bear upon those judgments. *See Whiteaker*, 241 S.W.3d at 626-27 ("[T]he judiciary has deferred to the legislature

7

to decide when, if, or to what extent to waive immunity, as these decisions entail sensitive policy judgments concerning the use of public resources and governmental functions that are the proper domain of the legislative rather than judicial branch."); *see also City of Galveston*, 271 S.W.3d at 469 (emphasizing that waiver of immunity "depends entirely upon statute") (quoting *Dallas County Mental Health and Mental Retardation v. Bossley*, 968 S.W.2d 339, 341 (Tex. 1998)). Relatedly, it is said that there exists a "heavy presumption in favor of immunity," *City of Galveston*, 271 S.W.3d at 469, and that "special rules of construction apply" to statutes that are asserted to be waivers of immunity—"no statute should be construed to waive immunity absent 'clear and unambiguous language.'" *State v. Oakley*, 227 S.W.3d 58, 62 (Tex. 2007) (quoting Tex. Gov't Code Ann. § 311.034 (West 2005 & Supp. 2009).

**The Dugoshes' claims**

To establish the probate court's subject-matter jurisdiction, the Dugoshes have relied on one of the legislative waivers of sovereign immunity found in the tort claims act, section 101.021(2) of the civil practice and remedies code. That provision partially waives a "governmental unit's"[5] immunity from suit and liability for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2) (waiving liability); *see id.* § 101.025 (waiving immunity from suit "to the extent of

---

[5] The Dugoshes do not dispute that TSBVI is a governmental unit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.001(3)(A), (D) (West 2005) (defining "governmental unit" under tort claims act).

8

liability created by this chapter").[6]  To establish a waiver of TSBVI's sovereign immunity under section 101.021(2), the Dugoshes had the initial burden of alleging facts affirmatively demonstrating that (1) a negligent or other culpable "condition or use" of (2) "tangible personal or real property" (3) proximately caused Christopher's death; and (4) TSBVI would be liable to them under Texas law for these acts or omissions if it were a private person.  *See Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998); *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 299 (Tex. 1976).  To meet this burden, the Dugoshes attempted to assert two theories they contend constitute the requisite "condition or use" of tangible personal property necessary to waive immunity under section 101.021(2)—(1) the TSBVI personnel who prepared, served, or "fed" Christopher his last meal negligently or with gross negligence gave him pieces of food much larger than he could safely consume, given his limitations and conditions, proximately causing his choking death; and (2) the TSBVI personnel negligently or with gross negligence administered a fatal overdose of medication to Christopher.

### Food piece sizes

#### Pleading allegations

Regarding their first waiver theory, the Dugoshes pled the following facts:

> At the time of his death, Christopher Dugosh was a student at [TSBVI]. Christopher was blind, deaf and profoundly impaired due to birth defects.  His IQ was between 20 and 25.  His arms and legs were deformed and he was far below the weight and height for his age.

---

[6]  *See also id.* §§ 101.023(a) (West 2005) (limits on State's liability exposure), .024 (West 2005) (no waiver for exemplary damages).

9

The Dugoshes attached a waist-up photograph of Christopher to their petition. It shows physical features including the form and configuration of Christopher's arms. Each of Christopher's arms is bent sharply upward from the elbow area, in a manner somewhat resembling a wing on a baby bird. Each arm ends in a single thumblike digit that is bent sharply downward from the wrist area.

The Dugoshes continued:

Mr. and Mrs. Dugosh informed TSBVI, through its employees, that Christopher should be given small food portions because his birth defects made it difficult for him to digest food and he was at risk for choking. Mr. and/or Mrs. Dugosh demonstrated to TSBVI's employees the size of the food Christopher should be given and told them that he should be given a toddler's diet. Mr. and Mrs. Dugosh also provided a book to TSBVI that contained information on Christopher's condition. That book also stated that Christopher was to be fed a toddler's diet. TSBVI's employees were also provided a diagram or drawing of the size of Christopher's food. TSBVI's employees caring for Christopher knew or should have known that Christopher's food was to be cut up in small pieces, i.e., pieces smaller than the hot dogs and broccoli served and fed to Christopher by Cogburn and Smith on May 19, 2005.

Chris Cogburn and Carl Smith were responsible for Christopher's care on the night that he day [sic] that he died, May 19, 2005. Cogburn and Smith were employees of TSBVI and were acting in the course and scope of their employment with TSBVI on the date of Christopher's death. On May 19, 2005, TSBVI employees including Chris Cogburn and Carl Smith selected, bought, prepared, cooked and cut Christopher Dugosh's food for his dinner meal and fed that food to Christopher to eat. Christopher had deformed arms and could not eat without assistance from Cogburn and Smith. Cogburn and Smith cut pieces of broccoli and hot dog and fed such food to Christopher Dugosh to eat. The size of the broccoli was 1 ½ inches long and the size of the hot dog was 1 inch all around. Approximately four pieces of broccoli and hot dog were given to Christopher by Cogburn and Smith. Christopher was given french fries which were not cut into small pieces.

Christopher choked on the broccoli, hot dogs and other food prepared, served and provided to him by Cogburn and Smith. The 1 ½ " pieces of broccoli and 1 inch all around pieces of hot dog were far larger than the portions that would be consistent

10

with a toddler diet, were larger than the size of the pieces of food demonstrated to the staff of TSBVI by Mr. and/or Mrs. Dugosh and were larger than the size of the food on the diagram or drawing available to Cogburn and Smith on the date of Christopher's death. Cogburn and Smith's negligence in providing 1 ½" pieces of broccoli and 1 inch all around pieces of hot dog to Christopher was a proximate cause of Christopher's choking, asphyxiation, and death.

There is no dispute that the Dugoshes sufficiently alleged that the acts or omissions of which they complain were committed by TSBVI personnel acting within the scope of their employment and for which the institution, were it a private employer, would be legally responsible. Nor is there any dispute that the food portions these employees prepared, served and/or "fed" to Christopher were the "tangible personal property" of TSBVI under section 101.021(2).[7] However, TSBVI has challenged whether the facts the Dugoshes allege constitute a "condition or use" of the food portions and whether they have demonstrated a sufficient causal nexus between any such negligent or wrongful "use" or "condition" and Christopher's death by choking. Before turning to these legal questions, we must first take into account the jurisdictional evidence that the parties presented to the probate court. *See Miranda*, 133 S.W.3d at 227; *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555.

---

[7] *See University of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 178 (Tex. 1994) ("Although 'tangible' is not defined in the Tort Claims Act, there can be little doubt that tangible personal property refers to something that has a corporeal, concrete, and palpable existence.").

*Jurisdictional evidence*

<u>How Christopher was "fed"</u>

Although TSBVI did not dispute that its personnel had cooked, prepared, cut into pieces, and served the food on which Christopher later choked, TSBVI presented evidence in an attempt to negate any allegation that its personnel had placed food either directly in Christopher's mouth or onto his eating utensil. TSBVI's evidence included documents reflecting the status of Christopher's life skills at various junctures during his time at TSBVI; an excerpt from the deposition of Kerim Pierce, one of the TSBVI employees involved with Christopher's care; the medical examiner's autopsy report;[8] and an affidavit from Monte Chambers, R.N., the director of TSBVI's Health Center. Chambers's affidavit attached medical-history forms from Christopher's personal physician describing Christopher's conditions and impairments—and including the warning that Christopher was at risk of "choking" and required a "toddler" diet with "no milk, beef, small portions." The Dugoshes, in turn, presented, in addition to the aforementioned photograph of Christopher,[9] live testimony from Christopher's father, appellee Richard Dugosh, and Carl Smith and Chris Cogburn, the TSBVI personnel implicated by the Dugoshes' pleading allegations. TSBVI also elicited important testimony from Smith and Cogburn on cross-examination. Both sides were also permitted to read some deposition excerpts into the record.

---

[8] The report was included in medical records that had been subpoenaed from Christopher's psychiatrist. As discussed below, the copy of the report in evidence included some handwritten notes.

[9] The Dugoshes also introduced a photograph of the adapted spoon Christopher used at TSBVI, discussed below.

Smith and Cogburn acknowledged that, as the Dugoshes had alleged, they were the TSBVI personnel who had been responsible for preparing and serving Christopher his last meal and that this meal had consisted of broccoli, a hot dog, and french fries. Smith, who had been Christopher's "primary residence instructor," admitted that he had prepared the hot dog and broken it into four pieces for Christopher to consume. He further stated that either he or Cogburn had similarly broken the french fries into pieces. Cogburn, in turn, admitted that he had prepared the broccoli and cut it into pieces, although he could not remember the number of pieces. Smith further admitted that because of Christopher's limitations, Christopher was dependent on them to prepare, cut, and serve his food, as he "had no way of cutting his own food himself and feeding it to himself." Smith and Cogburn likewise acknowledged that they had remained in close proximity to Christopher while he was eating.

TSBVI presented evidence that by the time of Christopher's last meal, he had become proficient in using an adapted spoon to scoop up food and move it to his mouth. The Dugoshes introduced a photograph of the spoon into evidence. The photograph shows a spoonlike device with a strap that was used to attach it to Christopher's arm. In his deposition, Kerim Pierce recounted that Christopher's spoon had "sort of revolutionized his eating because it allowed him to be independent in scooping his food and eating it, whereas previously . . . he had been fed mostly." TSBVI also introduced two documents on its letterhead titled, "Residential Annual Report of Present Competencies." Each document contains a summary of Christopher's "strengths" and "needs" with respect to "domestic" and "recreational/leisure" "basic skills" and identifies various "priority areas" or goals for Christopher's further development in these areas. The first of these documents, dated

13

February 26, 2004, identifies among Christopher's "domestic" skills strengths, "Chris has learned to eat very effectively with an adapted spoon, and can use an adapted cup to drink." The second, dated January 10, 2005, states, "Chris has learned to eat very neatly with an adapted spoon, and does so with no assistance except to affix the spoon to his arm." Each documents contains both Richard and Mel Dugosh's signatures, along with those of various other TSBVI educators and counselors, verifying that each had been present at a meeting to discuss the "proceedings and recommendations," understood what had been discussed, and agreed with the proceedings and recommendations.

Cogburn squarely denied that he ever assisted Christopher in getting food into his mouth. TSBVI's counsel was also permitted to read into the record an excerpt from Smith's deposition in which Smith similarly denied that anyone helped Christopher feed himself during his last meal.[10] However, Cogburn's testimony was inconsistent and somewhat equivocal as to whether he ever assisted Christopher in getting food onto his spoon. Initially, when asked by the Dugoshes' counsel whether he helped Christopher with getting the hot dog or broccoli into his mouth, Cogburn admitted that "I help him with the spoon" by "putting the spoon on the plate and helping him get the food on it." In response to further questioning, Cogburn observed that food would sometimes fall off Christopher's spoon while he was trying to eat it. He was then asked by the Dugoshes' counsel whether he would help Christopher get the food back on the spoon in that situation. Cogburn

---

[10] Smith testified:

Q:    [by the Dugoshes' counsel]    Did Chris feed himself that night with his
      spoon or did someone help him?

A:    He fed himself.

14

responded, "I don't recall if I—if that was something I would do."  Later, the Dugoshes' counsel returned to that question, and Cogburn persisted in denying recollection of what he would do when food fell off of Christopher's spoon.  Then, during cross-examination by TSBVI's counsel, Cogburn divulged that if "the hot dog falls off onto the table," he would "put it back on the plate," but again claimed that he did not recall what he would do when food fell off Christopher's spoon.  However, with continued questioning by TSBVI's counsel, Cogburn began repeatedly denying that he placed food either in Christopher's mouth or on his spoon.  At that juncture, Cogburn also insisted that the lack of recollection he had previously acknowledged concerned whether, when returning dropped food to Christopher's plate, he might have placed the food onto Christopher's spoon if the spoon was positioned there.[11]

---

[11]  The following exchange between Cogburn and TSBVI's counsel is illustrative:

Q:      Did you ever lift food from Christopher's plate and put it into his mouth?

A:      No.  What I do is I—I make sure the pieces are cut and accessible for the kids.

Q:      Okay.  So you prepared the food?

A:      I prepare the food.

Q:      And you put it in the plate?

A:      And I put it in the plate.

Q:      But you don't—

A:      And the if he—the hot dog falls off on to the table I put it back on to the plate.

Q:      On the plate, okay?

15

A:       Yeah.

Q:       But not on to the spoon?

A:       I don't recall—I don't—that's—that's a—

Q:       Is that what you're saying you don't recall about?

A:       That's what I'm saying I don't recall.  And I don't—I don't do that.  I don't —I don't put the food on the spoon and I don't lift it to the kids' mouth.

Q:       Okay.

A:       My—my not recalling is the—putting it on to the plate when there is a spoon on the plate.  That's a gray area, putting on the plate.

Q:       You recall maybe—and I—and I'm not trying to feed you words, I'm trying to figure out what it is that you don't recall.  And the Court—the Court needs to know this too.

A:       Yeah.  I don't recall—I don't put the food on the spoon and I don't feed the kids.

Q:       Okay.

A:       What I don't recall is—I mean, I put the food on the plate and—. . .

A:       I think I'm making this more complicated because I don't put the food on the spoon.  What made me say I don't recall is that the—the spoon is on the plate, I put the food on the plate, it gets on the spoon.  It's not—

Q:       I understand.

A:       If that makes sense.

Q:       I understand.  So if you — if a piece of food had gotten out of the plate and you—like on the table and you put it back on the plate—

A:       Uh-huh.

As for Richard Dugosh, he testified that during the eighteen years when he and Mel were Christopher's primary caregivers, Christopher had required continual monitoring and assistance when eating, even when using an adaptive spoon, and "wouldn't be able to feed himself." Richard elaborated that because of the difficulties Christopher encountered in using his arms, food would roll or fall off his spoon. Consequently, Richard recounted, a caregiver would need to remain with Christopher while he ate and put food back on the spoon when it fell off. However, while Richard indicted that it would sometimes be necessary to administer medication to Christopher by spooning it into his mouth, as he "would spit it out" otherwise, Richard did not testify that caregivers would place food directly into his mouth.

Richard further asserted, without citing specific factual support, that the extent to which Christopher required assistance when eating remained unchanged after Christopher moved to TSBVI. During cross-examination, however, Richard conceded that he had no personal knowledge of how Christopher ate his meal on the evening he died. Richard also acknowledged signing the two previously discussed TSBVI "Residential Annual Reports of Present Competencies."

---

Q:    —if the spoon might have been in the—in the plate or on the plate you might
      have actually put it on the spoon in that circumstance. It's not that you would
      have deliberately put it on the spoon. Is that what you were saying?

A:    Yeah. That's what I don't recall too, it's not—I don't—I'm not—

Q:    You don't recall that with specificity?

A:    I don't recall the specificity and the gradation of the spoon—the spoon is like
      this and the hot dog rolls on the spoon. It's just that I don't recall. That's—I
      don't put the food on the spoon and I don't assist a kid with delivering the
      food to his or her mouth. I don't—

17

In addition, the Dugoshes' counsel was permitted to read into the record an excerpt from the deposition of Mary Lou Rink, the TSBVI's dietician at the time of Christopher's death, to the effect that Christopher's conditions necessitated that someone remain with him while he ate[12] and an excerpt from Cogburn's deposition in which he stated that, after he and Smith prepared the food, "We fed Chris."

On this record, we conclude that TSBVI has met its burden of conclusively negating any allegation that Smith or Cogburn placed food directly into Christopher's mouth with an eating utensil or otherwise. *See Miranda*, 133 S.W.3d at 227-28. TSBVI presented evidence that neither Smith nor Cogburn "fed" Christopher in this manner, and the Dugoshes presented no evidence that they did. The conclusion that Smith or Cogburn "fed" Christopher in *some* manner, without more, is insufficient to raise a fact issue as to whether they did so by placing food in his mouth. *See id.*; *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam). However, we conclude—especially in light of Cogburn's testimony—that TSBVI has not met its burden to

---

[12] Rink testified:

Q:     Somebody would be there with him [Christopher]?

A:     Uh-huh.

Q:     Why would they be there with him?

A:     Well, a toddler diet, somebody would need to be feeding, you know, be sitting there with him while he ate.

Q:     Why would somebody need to be there with him while he ate?

A:     Because he couldn't eat by himself.

18

conclusively negate the allegation that Cogburn "fed" Christopher by placing food on his adapted spoon and helping him put food back on the spoon when it fell off. Consequently, we presume the truth of that allegation—along with the Dugoshes' unchallenged allegations that Smith and Cogburn prepared Christopher's meal and cut the broccoli and hot dog into the sized pieces described in the medical examiner's report—when analyzing whether the Dugoshes have asserted the required "condition or use" of tangible personal property under section 101.021(B). *See id.*

<u>Causal nexus between the food and Christopher's death</u>

TSBVI presented evidence in an attempt to establish that several minutes passed between the time that Christopher finished eating and when he first began choking. The medical examiner's report reflects a contemporaneous account from Smith that Christopher ate dinner at approximately 4:50 p.m., was playing in his room at approximately 5:05 p.m., and then, at approximately 5:26 p.m., ran down the hallway gasping for air and collapsed in front of Smith. Cogburn similarly testified that the choking event occurred 15-20 minutes after Christopher had finished eating. According to Cogburn, "When Chris finished eating he went into his room and I cleaned his plate and the—the table and I went into the common area and was talking and watching TV with the kids and Kerim and Mike Beninger [another TSBVI staffer]. And then Chris came out and then went—he came into the common area and then went back into his room and then came back out again a couple minutes later and that's when he looked—he looked like he was having trouble and that's when Kerim and Mike went and assisted him." Cogburn indicated that there was no question Christopher had finished his meal and swallowed all of his food before going to his room. The Dugoshes did not present evidence to controvert that at least fifteen to twenty minutes

19

elapsed between the time Christopher finished his meal and when he began showing signs of choking and that Christopher had even been playing in his room for approximately 15-20 minutes in the meantime.

On the other hand, Cogburn acknowledged that Christopher had regurgitated some of his food before he choked and had regurgitated "just a dribble" while still eating. As previously noted, the medical examiner later found "poorly chewed" portions of food material—"including a portion of the end of a hot dog measuring 1 inch all around . . . pieces of broccoli measuring up to 1-1/2 inches in dimension as well as similar pieces of dumplings"—"packed" in both Christopher's upper airway and his esophagus. It was "asphyxia due to choking on bolus of food," with his Cornelia de Lange syndrome a "contributing condition," that the medical examiner concluded caused Christopher's death.

### Cutting-up of the food

Finally, because it becomes significant to our analysis below, we note that TSBVI presented uncontroverted evidence that either Smith or Cogburn broke the french fries into pieces before serving them to Christopher. While the Dugoshes had pled that "Cogburn and Smith cut pieces of broccoli and hot dog" (which the jurisdictional evidence confirmed), they also had alleged that "Christopher was given french fries which were not cut into small pieces." The latter allegation is negated by the uncontroverted evidence that Smith or Cogburn did, in fact, break the french fries into pieces before serving them to Christopher. *See Miranda*, 133 S.W.3d at 227-28.

*Analysis*

We now consider whether the facts pled by the Dugoshes and not conclusively negated by TSBVI invoked the probate court's jurisdiction by establishing a "condition or use" of tangible personal property attributable to TSBVI that proximately caused Christopher's death. *See Miranda*, 133 S.W.3d at 226-28.

### "Use" of the food?

The legislature has never defined the term "use" under section 101.021(2), and Texas courts have been vexed for decades by the term's vagueness and arbitrary operation. *See, e.g., University of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 178 (Tex. 1994) (summarizing the supreme court's "long and arduous history" of struggling to construe section 101.021(2) and of requesting the legislature to clarify the provision); *see also Miller*, 51 S.W.3d at 589-93 (Hecht, J., concurring) (concluding that "it is simply impossible for the courts to meaningfully construe and consistently apply the use-of-property standard in the Tort Claims Act" and attributing the problem principally to the absence of any discernable guiding legislative policy regarding when or why sovereign immunity should be waived in a particular case). Despite these challenges, the supreme court over the decades has enunciated principles that give us some guidance here.

Lacking a legislative definition of "use," the supreme court has applied the ordinary meaning of the term—"to put or bring into action or service; to employ for or apply to a given

21

purpose." *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 & n.10 (Tex. 2004).[13] The court

has further reasoned from the context of the legislature's use of "use" in section 101.021(2) that the

governmental unit whose conduct is challenged must itself be the "user" of the property to waive

immunity. *Id.* at 246.

As a general rule, a governmental unit's act of furnishing tangible personal property

to a person for him to use is not considered a "use" of the property by the unit that can waive

immunity under section 101.021(2). Two stark illustrations of this rule's recent application by

the Texas Supreme Court are provided in *Dallas County v. Posey*, 290 S.W.3d 869, 870 (Tex. 2009)

(per curiam), and *Cowan*, 128 S.W.3d at 245-47. Both *Posey* and *Cowan* involved suits against

governmental units arising from suicides by patients or inmates in unit-owned facilities. In both

cases, the individual used personal property furnished or provided by the governmental unit to kill

himself. *Posey*, 290 S.W.3d at 870 (inmate hung himself with ligature he devised from frayed

receiver cord of telephone in his cell); *Cowan*, 128 S.W.3d at 245-47 (mental hospital patient hung

himself with suspenders and walker that hospital had returned to him). In each case, the supreme

court held that the governmental unit did not, by furnishing or providing the property to the decedent,

"use" the property so as to come within section 101.021(2)'s waiver of immunity. *See Posey*,

290 S.W.3d at 870 (no "use" of telephone because "the county did no more than place Posey in a cell

with a corded telephone, which he used to commit suicide"); *Cowan*, 128 S.W.3d at 245-47 ("A

---

[13]    *Accord City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (when construing statutes, we rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results).

governmental unit does not 'use' personal property merely by allowing someone else to use it and nothing more. . . . By providing Cowan his walker and suspenders, the Hospital did not 'use' them within the meaning of section 101.021(2)."). This was so, significantly, even though the plaintiffs in both *Posey* and *Cowan* had alleged and/or presented evidence that the decedent had presented a suicide risk that the governmental unit was negligent in ignoring when furnishing the decedent the property. *Posey*, 290 S.W.3d at 870-72; *Cowan*, 128 S.W.3d at 245.

On the other hand, the supreme court has continued to recognize what it now terms a narrow exception to the rule that a governmental unit's act of furnishing personal property to an individual to use is not a "use" of that property by the government—immunity is waived under section 101.021(2) for "claims in which a plaintiff alleges that a state actor has provided property that lacks an integral safety component and that the lack of this integral safety component led to the plaintiff's injuries." *Cowan*, 128 S.W.3d at 247 (quoting *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 585 (Tex. 1996)). This exception derives from an earlier line of cases in which the supreme court had held that governmental units' negligent provision of defective or deficient protective equipment was a "condition or use" (it did not specify whether it was one, the other, or both) of personal property that waived immunity under section 101.021(2). *Robinson v. Central Tex. MHMR Ctr.*, 780 S.W.2d 169, 169, 171 (Tex. 1989) (MHMR center's provision of swim attire lacking life preserver to epileptic child prone to seizures constituted a "condition or use" that waived immunity); *Lowe*, 540 S.W.3d at 298-300 (university's provision of protective gear to football player that did not include special protection for his injured knee constituted a "condition or use" that waived immunity); *Overton Mem'l Hosp. v. McGuire*, 518 S.W.2d 528, 528-29 (Tex. 1975)

(per curiam) (hospital's provision of bed for patient that was not equipped with side rails was a "condition or use" of property that waived immunity). Although the literal language and reasoning of these decisions were arguably broader, the supreme court has subsequently clarified that "the precedential value of [*Robinson*, *Lowe*, and *Overton*] is . . . limited to claims in which a plaintiff alleges that a state actor has provided property that lacks an integral safety component and that the lack of this integral component led to the plaintiff's injuries." *Clark*, 923 S.W.2d at 585 (also terming the cases "perhaps the outer bounds of what we have defined as use of tangible personal property.").

Underlying the supreme court's contemporary view of these decisions is its reasoning that whatever "use" may mean under section 101.021(2), it cannot mean a *failure* to use or "*non*-use" of personal property. *See id.* A related concern is that "use" of personal property under section 101.021(2) cannot mean every form of negligence committed by a governmental unit that happens to involve personal property in some way, as this would expand what the legislature plainly intended as a limited waiver of immunity into effectively a general waiver. *See id.* at 585-86 ("There cannot be a waiver of sovereign immunity in every case in which medical treatment is provided in a public facility. . . . If such a complaint were enough to constitute the use of tangible personal property under the Act, the doctrine of sovereign immunity would be rendered a nullity.") (citing *Lowe*, 540 S.W.2d at 302 (Greenhill, C.J., concurring) ("It is difficult to imagine a tort case which does not involve the use, or nonuse, of some item of real or personal property; and to me, if there is a waiver in all cases where some item of personal property is either used or not used, there is virtually an unrestricted waiver of immunity.")). Driven by these concerns, the supreme court has

24

sought to distinguish between a governmental unit's affirmative act of furnishing or providing personal property that completely lacks an "integral safety component," which it continues to regard as waiving immunity under *Robinson*, *Lowe*, and *Overton*, from a governmental unit's failure to provide personal property, or provide better, safer, alternative personal property, which it regards as a non-use of property that does not waive immunity. *See Texas A&M Univ. v. Bishop*, 156 S.W.3d 580, 583-84 (Tex. 2005) (allegation that university provided student actors knife without adequate "stab pad" did not assert "use" of the knife by university or complete absence of integral safety component, but a "non-use" by failing to provide a more effective safety feature); *Clark*, 923 S.W.2d at 585 (mental hospital's prescribing oral medication alleged to be less effective than alternative injectable treatment complained of a non-use of property, a failure to provide a more effective treatment).

TSBVI equates this case with *Posey* and *Cowan*, urging that it did no more than provide food for Christopher's use, but itself made no "use" of the food. It further asserts that there are no allegations the food was "defective" or lacking in any "integral safety component" and that, to the extent the size of the food pieces could be considered a "safety component," the Dugoshes complain not of a complete absence of that component but only of TSBVI's failure to provide a better alternative—Smith and Cogburn cut or broke the food into pieces, but allegedly were negligent in failing to provide smaller, safer pieces. Thus, TSBVI concludes, the Dugoshes' claims would be governed by *Bishop* and *Clark*, and would constitute claims for non-use rather than use of personal property. *Bishop*, 156 S.W.3d 583-84; *Clark*, 923 S.W.2d at 585.

25

In response, the Dugoshes attempt to distinguish *Posey* and *Cowan* by suggesting that Cogburn and Smith had greater involvement with the food than did the governmental units in those cases. They urge that "Cogburn and Smith selected, purchased, cooked, prepared and cut the oversized hot dogs and broccoli." They further assert that because "Christopher's arms were deformed," TSBVI "had to feed the broccoli and hot dogs to Christopher" and assist him in consuming it. As we have previously explained, TSBVI negated any allegation that TSBVI employees placed the food in Christopher's mouth, but still before us are the Dugoshes' allegations that TSBVI cooked, prepared, cut and served the food and that Cogburn assisted Christopher in getting the food onto his adapted spoon. These are allegations, the Dugoshes reason, that "the oversized broccoli and hot dogs were 'put into service' and employed for a 'given purpose' by employees of TSBVI." They additionally suggest that this case is governed by *Overton*, the "integral safety component" case that involved a hospital patient being placed into a bed lacking safety rails. *See Overton Mem'l Hosp.*, 518 S.W.2d at 528-29.

Guided by the Texas Supreme Court's recent jurisprudence delineating the meaning of "use" of tangible personal property under section 101.021(2), we must conclude that the Dugoshes assert claims of TSBVI's ordinary negligence or non-use of personal property, not a "use" of property for which section 101.021(2) waives immunity. While TSBVI cooked, cut, and prepared the food and even helped Christopher get it onto his spoon, it remains that it was Christopher, not TSBVI, that ultimately put the food to its intended use by eating it. *See Bishop*, 156 S.W.3d at 583-84 (although faculty advisers allowed use of real knife in student theatrical production, the advisors "did not themselves 'put or bring [the knife] into action or service' or 'employ [the knife] for or

26

apply [it] to a given purpose,' as we have said the term 'use' intends.") (modification in original). Alternatively, even if it could be said that Smith and Cogburn "used" the food in some sense by preparing, cutting or breaking it into pieces, and giving it to Christopher, such "uses" in themselves would lack the requisite causal nexus to Christopher's choking and death. Everything turns, under the Dugoshes' theory of liability and waiver, on the fact that Christopher ate the food. This is a use of the food by Christopher, not a use by TSBVI. To this extent, this case is analogous to *Posey* and *Cowan*.

We recognize that under the Dugoshes' pleadings and the jurisdictional evidence, as viewed through the prism of our standard of review, Christopher was highly if not totally dependent upon Smith and Cogburn for the food that he ate and had mental, visual, and auditory impairments that would have reduced his capacity to ascertain the risk of eating the food he was given. However, we must ultimately conclude that *Posey* and *Cowan* are not distinguishable on that basis. In both *Posey* and *Cowan*, the decedent was vulnerable to suicidal impulses, yet the supreme court held that the government unit's act of furnishing him with the very property he used to kill himself was not a "use" of that property and that it was instead the decedent himself who had "used" the property to fatal ends. *Posey*, 290 S.W.3d at 870-72; *Cowan*, 128 S.W.3d at 245. Christopher was in an identical position to the decedents in *Posey* and *Cowan* as far as the relevant "use" of tangible personal property is concerned.

To the extent the Dugoshes are attempting to complain of the absence of an "integral safety component" in the food Christopher was given (i.e., the absence of pieces sufficiently small for Christopher to consume safely), we agree with TSBVI that this complaint would be

27

governed by *Bishop* and *Clark* and would not fall within the *Overton* line of cases. Assuming the size of the food pieces is a "safety component" for purposes of this rule, the Dugoshes complain (once the jurisdictional evidence is considered) not of the complete absence of such a component (i.e., that Smith and Cogburn failed to cut or break the broccoli, hot dogs, or french fries into pieces at all), but of TSBVI's failure to use a safer or better alternative component (i.e., giving Christopher smaller, safer pieces and/or using kitchen utensils to cut the pieces smaller). *See Bishop*, 156 S.W.3d 583-84; *Clark*, 923 S.W.2d at 585.

The real substance of the Dugoshes' complaint is that TSBVI negligently failed to instruct and supervise Smith and Cogburn in preparing Christopher's food and/or that Smith and Cogburn negligently failed to carry out those instructions, not that TSBVI "used" the food in the sense required to waive immunity under section 101.021(2). *See Bishop*, 156 S.W.3d 583. The mere fact that these alleged acts of negligence involved or concerned the tangible personal property of food is not enough to waive TSBVI's immunity under section 101.021(2), and to hold otherwise "would be tantamount to abolishing [sovereign] immunity, contrary to the limited waiver the Legislature clearly intended." *Id.* (quoting *Clark*, 923 S.W.2d at 585).

In urging that TSBVI "used" the food in some respect relevant to waiver under section 101.021(2), the Dugoshes also rely on a decision of the Texarkana Court of Appeals, *Texas State Technical College v. Beavers*, 218 S.W.3d 258 (Tex. App.—Texarkana 2007, no pet.). In *Beavers*, a student in a diesel engine testing and repair course was injured while using a hydraulic hoist as part of his course instruction. He sued the college for negligence and sought to establish waiver of the college's sovereign immunity by alleging his injuries had been proximately caused

28

by the college's "use" of the hoist. While holding that the student's claims did not fall within the complete absence of an "integral safety component" exception for personal property furnished to an individual to use, *id*. at 263-65, the Texarkana court nonetheless concluded that the college had "used" the hoist through the manner in which it had utilized the hoist as part of the student's course instruction. *See id.* at 265-67. We do not believe these facts involving a college's use of an instructional aid in a class are analogous to TSBVI's provision of food for Christopher to eat. Consequently, we are not persuaded that *Beavers* counsels a departure from our analysis and conclusion that the Dugoshes have not asserted claims within the use-of-property waiver of section 101.021(2).

We hold that the Dugoshes have not asserted claims that Christopher's death was proximately caused by TSBVI's negligent "use" of tangible personal property so as to come within section 101.021(2)'s waiver of sovereign immunity.

### "Condition" of the food?

Even if they have not asserted a claim of negligent "use" of tangible personal property, the Dugoshes urge, they have nonetheless complained of a "condition" of property for which immunity is waived under section 101.021(2)—the food pieces that Christopher was served or "fed" were too large for him to consume safely. As with "use," the legislature did not define what a "condition" of property means under section 101.021(B), so Texas courts have looked to the ordinary meaning of the term—"either an intentional or an inadvertent state of being." *Sparkman v. Maxwell*, 519 S.W.2d 852, 858 (Tex. 1975). With respect to negligence clams concerning real property, it is established that section 101.021(2) incorporates premises-liability

29

concepts and limitations. *See City of Austin v. Leggett*, 257 S.W.3d 456, 462-63 (Tex. App.—Austin 2008, pet. denied). Regarding "conditions" of personal property for which section 101.021(2) waives immunity, the Texas Supreme Court has stated that "condition" implies that the property is "defective or inadequate," *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex. 1983), and that such defect or inadequacy "pose[s] a hazard in the intended and ordinary use of the property." *Posey*, 290 S.W.3d at 872. With this, the supreme court has emphasized the requirement of a causal nexus between the "condition" and the injury made the basis for suit. *See id.*; *Bossley*, 968 S.W.2d at 343. This nexus requires "more than the mere involvement of property; rather, the condition must actually have caused the injury." *Posey*, 290 S.W.3d at 872.

As it did with "use" of tangible personal property section 101.021(2), *Posey* provides a recent illustration of the supreme court's view regarding "conditions" of tangible personal property that can waive immunity under section 101.021(2). The decedent in *Posey* was placed in a county-jail holding cell containing a land-line telephone whose handheld receiver was connected to the phone by a cord. The cord had exposed wires. The decedent killed himself by fashioning a ligature by running the telephone receiver through the exposed wires. *See id.* at 870-72. In addition to alleging that the county had "used" the phone by giving it to the decedent, the deceased's parents asserted that the exposed wires were a "condition" of the phone that had proximately caused the deceased's death. *See id.* In rejecting that theory as a matter of law, the supreme court acknowledged that the exposed wires might have been a "condition"—"a hazard in the intended and ordinary use of the property"—inasmuch as they "posed an electrical hazard to an ordinary user of the telephone." *Id.* at 872. Nonetheless, the court reasoned, the required causal nexus between that

30

condition and the death was lacking—"the exposed wires here did not cause the injury; they instead constituted no more than a condition of the property that was then used by Posey to form a ligature for suicide." *Id.*

As TSBVI points out, the Dugoshes do not allege that there was anything hazardous or defective about the broccoli, hot dog, and french fries with respect to their ordinary and intended use as food generally. Instead, their complaint is that TSBVI personnel failed to furnish Christopher smaller, safer pieces of this food (or to cut or break the food into smaller pieces). The Dugoshes rely on the ordinary meaning of "condition" (a particular mode or state of being). By alleging that "[t]he portions of hot dogs and broccoli fed to Christopher by Cogburn and Smith were too large" and that this caused Christopher to choke, the Dugoshes reason, they "have alleged a 'condition' of tangible personal property that was a proximate cause of Christopher's death."

We have concluded above that the Dugoshes' claims concern non-use of tangible personal property or other negligent acts of TSBVI that are beyond the scope of section 101.021(2)'s waiver. *See Bishop*, 156 S.W.3d 583-84; *Clark*, 923 S.W.2d at 585. As we understand the Texas Supreme Court's jurisprudence, we do not think that the Dugoshes can establish a waiver under section 101.021(2) merely by characterizing their claims of non-use of personal property (failure to use a safer alternative of smaller food pieces or to use kitchen utensils to cut the food into smaller pieces) or other general negligence as a complaint about the "condition" of the food portion sizes TSBVI *did* provide. To so hold would imply that every non-use case involving allegations of a governmental unit's negligence in failing to provide a safer alternative could establish waiver if only the plaintiff would couch his complaint in terms of the "condition" of the less-safe property the

31

unit did provide. We do not believe the principles governing waiver of sovereign immunity under section 101.021(2) work this way.

In cases where a plaintiff seeks to establish waiver of immunity under section 101.021(2) based on a governmental unit's furnishing of tangible personal property for another person to use, the Texas Supreme Court has appeared to require the complete absence of an "integral safety component" to waive immunity under either the "use" and "condition" prongs of the statute. The cases giving rise to the "integral safety component" exception do not distinguish between "condition or use." *See Robinson*, 780 S.W.2d at 169-71; *Lowe*, 540 S.W.3d at 298-300; *Overton Mem'l Hosp.*, 518 S.W.2d at 528-29. Likewise, in its more recent cases, the supreme court has characterized the "integral safety component" requirement as part of the "condition" prong, or both the "condition" and "use" prongs. *See Cowan*, 128 S.W.3d at 245 ("Respondents do not complain of the condition of Cowan's walker and suspenders. They do not assert, for example, that the walker and suspenders were defective or that they lacked some safety feature."), 247 ("As already noted, respondents make no such claim [of an absent 'integral safety component'] in this case."); *Texas Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001) ("The Tort Claims act and our cases have distinguished claims involving the failure to use, or the non-use of property, which do not waive sovereign immunity, from claims involving a '*condition or* use' of tangible personal property that causes injury, which do effect a waiver.") (emphasis added). Several of our sister courts, at least in recent years, have agreed with our assessment. *See Beavers*, 218 S.W.3d at 264 n.1 ("Whether the requirement is analyzed under the 'condition' or 'use' section of [section 101.021(2)], the Texas Supreme Court has made it clear that, unless the governmental

32

agency has 'used' tangible personal property in some other manner so as to waive immunity, merely supplying the property for another's use, without more, does not waive immunity unless the supplied property is completely lacking an integral safety component."); *see also University of N. Tex. v. Harvey*, 124 S.W.3d 216, 222-24 (Tex. App.—Fort Worth 2003, pet. denied) (applying the "integral safety component" requirement in determining whether immunity was waived under the "condition" prong of section 101.021(2)).

Guided by these decisions, we conclude that regardless whether the Dugoshes purport to rely on the "use" or "condition" prong of section 101.021, sovereign immunity is not waived for their complaint because it concerns tangible personal property furnished to Christopher for his use, not property that TSBVI used, and does not assert the complete absence of an "integral safety component" in that property, but only non-use of property or other acts of negligence by TSBVI for which section 101.021(2) does not waive immunity.

In contending otherwise, the Dugoshes rely on a decision from the San Antonio Court of Appeals that has some factual similarities to the present case. *See Webb County v. Sandoval*, 88 S.W.3d 290, 292-95 (Tex. App.—San Antonio 2002, no pet.) (*Sandoval I*). *Sandoval I* arose after a four-year-old child choked to death on chicken nuggets that had been served to her by a county-run Head Start program. Her parents sued the county seeking damages. The San Antonio Court of Appeals held that the parents sufficiently alleged the requisite "condition" under section 101.021(2) by pleading that the chicken nuggets were "overcooked, too hard and too large," and that this proximately caused the child to choke to death. *Id.* at 292-95.

33

As TSBVI points out, no Texas court to date has followed *Sandoval* for the proposition that alleging food is cooked to be "too hard" or "too large" and furnished to another person to use or consume, causing them to choke, alone states a claim for a "condition" of tangible personal property that waives sovereign immunity under section 101.021(2). And, assuming without deciding that *Sandoval I* correctly reflects Texas law, there are factual distinctions between it and the present case. Unlike here, there is no indication in *Sandoval I* that there were allegations or evidence Head Start staff had cut the chicken nuggets into smaller pieces. *See id.* at 292-95; *see also Webb County v. Sandoval*, 126 S.W.3d 264, 265-67 (Tex. App.—San Antonio 2003, no pet.) (*Sandoval II*) (in opinion following further proceedings after *Sandoval I*, citing jurisdictional evidence that nuggets had been prepared and served "in a manner consistent with the packaging instructions"). Thus, as far as the size of the nuggets is concerned, *Sandoval I* would arguably fall within the complete-absence-of-an-"integral safety component" line of cases. We also note that the asserted "condition" of the chicken nuggets in *Sandoval I* was one that would tend to create a choking hazard for persons generally and, unlike here, was not solely a function of the particular decedent's inability to consume them safely. Although the decedent was a four-year-old child—an age at which a person is not always prone to chew her food thoroughly and swallow it safely—the San Antonio court did not appear to view the child's age or related limitations as relevant to its analysis of the asserted "condition" and its causal nexus to the child's death.[14] Here, as we have noted, the Dugoshes do not

_____

[14] This is especially apparent in the court's opinion following further proceedings. Following *Sandoval I*, the county, resuming its efforts in the trial court, presented jurisdictional evidence in an attempt to negate the causal nexus between the "condition" of the chicken nuggets and the child's death. *Webb County v. Sandoval*, 126 S.W.3d 264, 266-67 (Tex. App.—San Antonio 2003, no pet.) (*Sandoval II*). This included affidavit testimony from Head Start personnel to the effect that nothing

34

allege that the food Christopher was served was hazardous to persons generally, only that TSBVI was negligent in failing to give *him* smaller, safer pieces of the food. In sum, we are not persuaded that *Sandoval* changes our analysis.

We hold that the Dugoshes have not asserted claims that Christopher's death was proximately caused by a "condition" of tangible personal property TSBVI furnished him, so as to waive immunity under section 101.021(2).

### Drug overdose

#### Pleading allegations

In addition to their allegations regarding the size of food pieces Christopher was furnished on the evening he died, the Dugoshes pled that Christopher's death was also caused by an overdose (i.e., a misuse) of medication administered by TSBVI staff:

---

about the chicken nuggets had been unusual or would have reasonably tended to cause a person to choke. The county also presented affidavit testimony from a paramedic who had treated the child at the scene, who recounted that he observed the food that was removed from the child's trachea and saw a "piece of chicken approximately two inches in length that seemed to be partially chewed." *Id.* at 267. Based on his observations, the paramedic opined that "it was obvious that the patient had not chewed the piece of chicken sufficiently in order to swallow it properly." *Id.* Based on this uncontroverted evidence, the San Antonio court concluded that while "[t]he chicken nugget blocked [the child's] trachea, . . . it was the failure to sufficiently chew the chicken nugget that caused her injuries." *Id.* Consequently, the court reasoned, "the evidence, at best, suggests Webb County did no more than furnish [the child] with the condition or object (the chicken nugget) which made her injuries possible" and, therefore, negated the casual nexus required to waive sovereign immunity under section 101.021(2). *Id.*

Again, the San Antonio court reached this conclusion despite the fact that the decedent was a four-year-old child. And arguably the same causation analysis would apply here—especially where there was undisputed evidence that Christopher had actually swallowed his food fifteen to twenty minutes before he began choking.

35

[A] medication (Wellbutrin) was provided to Christopher by TSBVI on the date of Christopher's death. Cogburn, Smith and/or other employees of TSBVI negligently withheld Christopher's prescribed medication for the purpose of giving Christopher more than the prescribed dose of such medication at times when Christopher's behavior was difficult to control or presented problems for TSBVI's employees. Christopher had a toxic level of Wellbutrin in his blood stream on the date of his death. The negligence and/or gross negligence of Cogburn, Smith and/or non-medical employees of TSBVI in withholding prescribed medications and then providing Christopher a toxic dosage of Wellbutrin on the date of his death was a proximate cause of Christopher's death.

*Jurisdictional evidence*

TSBVI presented evidence in an attempt to negate the Dugoshes' allegation that Christopher was administered a "toxic dose" of Wellbutrin. This included the copy of the medical examiner's autopsy report that TSBVI introduced at the hearing, which contained a handwritten notation indicating that this medication was "not at toxic level." Additionally, in the affidavit from Nurse Chambers, she testified that Christopher was "never administered more than his prescribed doses of Wellbutrin, nor was he ever administered toxic levels of Wellbutrin." The Dugoshes did not introduce any evidence to controvert TSBVI's evidence that Christopher had not been administered a toxic dose of Wellbutrin. To the contrary, as TSBVI emphasizes, Richard Dugosh acknowledged during cross-examination that he was unaware that his attorney had added this allegation to the Dugoshes' claims and that he could not identify any evidence to support that allegation.

We conclude that TSBVI met its burden of negating, as a matter of law, the Dugoshes' allegation that its personnel proximately caused Christopher's death by administering

36

a fatal overdose of Wellbutrin. *See Miranda*, 133 S.W.3d at 227-28. Consequently, sovereign immunity is not waived as to this allegation.

**The Dugoshes' cross-point**

In their cross-point, the Dugoshes argue that the probate court abused its discretion in excluding excerpts from two depositions they sought to introduce during the evidentiary hearing. The first set of excerpts was from the deposition of Mary Lou Rink, TSBVI's dietician at the time of Christopher's death. The second was from the deposition of Robert Bayardo, former Travis County Medical Examiner, who performed the autopsy on Christopher and prepared the report that TSBVI introduced into evidence.

The hearing took place over the course of two days. The reporter's record from the hearing reflects that immediately after Cogburn's testimony concluded, which was on the second day of the hearing, the parties took up the matter of deposition excerpts with the probate court. The record reflects that the Dugoshes' counsel furnished deposition excerpts to TSBVI's counsel and represented to the court that "I gave them all to her last night" (i.e., following the first day of the hearing). Following a break, TSBVI's counsel confirmed with the court that the Dugoshes' deadline for filing their response to TSBVI's plea to the jurisdiction had been nine days earlier. Counsel then objected to the Dugoshes' excepts as "hearsay," "not properly authenticated," "irrelevant," and "not timely," adding that "by receiving these at the earliest last night they serve as a surprise and we have no opportunity to counter them." Counsel further objected to Bayardo's deposition testimony on the ground that Bayardo had not been properly designated as an expert. TSBVI's counsel also tendered a list of page and line objections to the excerpts. In response, the Dugoshes' counsel offered to prove

37

up the authenticity of the excerpts but disputed that he had any duty to designate deposition page and line numbers prior to the evidentiary hearing. The probate court sustained TSBVI's objection to the excerpts' admission. Subsequently, in response to an inquiry from the Dugoshes' counsel, the court indicated that, in fact, counsel had been required to designate the deposition excerpts prior to the hearing.

On appeal, the Dugoshes complain that "the Court allowed TSBVI to introduce deposition excerpts" and "stated that it would permit Appellees to introduce deposition excerpts." They add that "[t]he deposition excerpts were relevant and properly authenticated," "[n]o scheduling order required the designation of deposition excerpts before the hearing," and that "Dr. Bayardo was designated as an expert." This is the entirety of the Dugoshes' arguments in support of their cross-point. TSBVI responds that the Dugoshes waived their cross-point by failing to adequately brief it. *See* Tex. R. App. P. 38.1(h). On this record, we need only hold that the Dugoshes have not met their burden of demonstrating that the district court abused its discretion in excluding their deposition excerpts. We overrule the Dugoshes's cross-point.

## CONCLUSION

As the Texas Supreme Court has observed, whether immunity is waived by section 101.021(2) turns on "problematic" distinctions between "use" and "non-use" of tangible personal property, *Miller*, 51 S.W.3d at 588-89, that lack grounding in any coherent policies as to *why* immunity should be waived in a particular case as opposed to another. *See id.* at 591 (Hecht, J., concurring). Yet it remains that "the Legislature drew that line in the Tort Claims Act," *Miller*, 51 S.W.3d at 589, and it is our duty to apply it, like we are bound to apply the doctrine of

38

sovereign immunity, unless and until the Texas Supreme Court or the Legislature instructs us otherwise. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 564 (Tex. App.—Austin 2004, no pet.).

Based on the foregoing analysis, we sustain TSBVI's third issue and hold that the Dugoshes have not asserted a claim for which sovereign immunity is waived under section 101.021(2). Consequently, they have not invoked the probate court's subject-matter jurisdiction, so we must reverse the probate court's order denying TSBVI's plea to the jurisdiction. Furthermore, because the Dugoshes' factual allegations have either been negated as a matter of law or affirmatively demonstrate that their claims are based on TSBVI's non-use of tangible personal property or other negligence for which sovereign immunity has not been waived,[15] we must render judgment dismissing the Dugoshes' claims with prejudice. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007); *Miranda*, 133 S.W.3d at 227. Because these holdings are dispositive of this appeal, we do not reach TSBVI's other issues. *See* Tex. R. App. P. 47.1.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton;
   Chief Justice Law not participating

Reversed and Rendered

Filed: March 26, 2010

_____

[15] I.e., under the Dugoshes' pleadings and uncontroverted jurisdictional evidence, Cogburn and Smith cut or broke the broccoli, hot dog, and french fries before serving them to Christopher, and thus did not furnish food entirely lacking this "integral safety component."